**Danny Gene FRITCHIE, Petitioner-Appellant,**

v.

**D. J. McCARTHY, Superintendent, Respondent-Appellee.**

No. 78–1870.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 16, 1981.

Decided Dec. 17, 1981.

As Amended Feb. 25, 1982.

Theodore E. Orliss, Monterey, Cal., for petitioner-appellant.

Andrew D. Amerson, Deputy Atty. Gen., Los Angeles, Cal., for respondent-appellee.

Before GOODWIN and SCHROEDER, Circuit Judges, and PALMIERI,* District Judge.

PALMIERI, District Judge:

The petitioner-appellant in this habeas corpus action, having previously been acquitted of murder in Florida in 1970 by reason of insanity, is currently serving a life sentence in a California state prison pursuant to a 1974 conviction in Los Angeles for first degree murder and armed robbery. He appeals from the denial of his petition brought in the Central District of California under 28 U.S.C. § 2254. The issues raised here are whether the use of appellant's confession to the prior murder was a violation of his rights under the Fifth and Fourteenth Amendments, and whether he was denied the effective assistance of counsel because his court-appointed lawyer failed to offer a defense based on mental incapacity. Petitioner unsuccessfully pursued his claim for release on habeas corpus before the California courts and thereafter reasserted the identical grounds before the United States District Court below. The district court, which adopted the United States Magistrate's report and recommendation as its opinion, ordered the state of California to disregard Fritchie's robbery conviction in determining his release date or eligibility for parole. The state has not appealed from that order. In all other respects, the district court denied Fritchie's petition, and Fritchie brought this appeal after obtaining a certificate of probable cause as required by F.R.App.P. Rule 22(b).

Petitioner's claim for release from commitment is based principally on the ground that his confession to the Florida murder was improperly admitted into evidence at his California trial. He alleges that the confession was not made voluntarily and was consequently inadmissible.

## THE FACTUAL BACKGROUND

Danny Gene Fritchie, now approximately 35 years old, has a long history of mental illness. The record shows that between 1965 and 1974 he was committed on at least ten occasions to state mental hospitals in California, Florida and Oklahoma. The many psychiatrists who have examined Fritchie over the years have generally diagnosed him as a chronic schizophrenic, though the diagnoses vary as to whether his schizophrenia is of the "paranoid" or the "undifferentiated" type. In 1970, Fritchie committed a brutal murder in Florida under circumstances strikingly similar to those which led to the California conviction now under review. One hour after the Florida murder, Fritchie turned himself over to the police and provided a fairly detailed account of the crime. His trial ended in a verdict of not guilty by reason of insanity. Although the Florida psychiatrist whose diagnosis led to the verdict of insanity had also recommended longterm hospitalization, doctors at the South Florida State Hospital to which Fritchie was committed after his acquittal found him to be in remission and recommended discharge from the hospital four months after the murder.

Besides the two murders, Fritchie has had a long history of lesser encounters with the law. He told the California psychiatrist that he was first arrested at age 15 for breaking and entering. In addition to numerous theft crimes, he has been arrested for arson (setting brush fires with no apparent motive) and for threatening the life of the President of the United States. Fritchie also admitted practicing homosexual prostitution for five years beginning at 16. He insisted that he was not a homosexual and expressed hatred for homosexuals. His two murder victims were homosexuals much older than he.

The California jury verdict convicting Fritchie of murder and robbery was supported by abundant evidence, which may be summarized as follows. The victim, William McMurtry, was approximately 82 years old and lived alone in a small apartment in

* Honorable Edmund L. Palmieri, Senior United States District Judge, Southern District of New York, sitting by designation.

Los Angeles. When McMurtry had not been seen for several days, one of his friends became worried, attempted unsuccessfully to reach him by telephone and finally went to investigate at McMurtry's apartment. Observing lights through a window but receiving no response at the door, the friend summoned the building manager, who broke into the apartment, found McMurtry's partially naked body on the bed, and called the police. The medical examiner testified at trial that McMurtry had suffered multiple stab wounds on both sides of the neck, multiple lacerations of the scalp and forehead, and a fractured dislocation of the upper spine. The murder weapons were identified as a butcher knife and a ceramic religious statue, both belonging to McMurtry and found in his apartment by the assailant. From the degree of decomposition of the body, the medical examiner established that McMurtry had been killed about a week before the autopsy performed on March 14, 1974.

The ensuing police investigation revealed that John Tyra had known McMurtry for over 20 years, during which time he had frequently slept in the victim's apartment. Despite Tyra's marriage and the birth of a child, he continued to frequent McMurtry, accompanying him on errands and cleaning his apartment for a small weekly payment. McMurtry was partially blind and relied on Tyra to help cash and deposit his pension checks. Tyra knew that McMurtry kept several hundred dollars' cash in his apartment hidden in his clothing.

When interviewed by the police, Tyra confessed to his participation in the robbery and murder, pleaded guilty to second degree murder and testified for the prosecution at Fritchie's trial. Tyra's testimony was substantially as follows. On the morning of March 8, he and the appellant, whom he had known for 12 years and with whom he worked as a window washer, went to McMurtry's apartment. An argument ensued between Tyra and McMurtry, in the course of which Tyra told McMurtry that he would "kick your head in." McMurtry told Tyra and Fritchie to leave, which they did at Fritchie's urging. Later, Fritchie suggested robbing McMurtry and killing him so as to make the death appear a suicide. Tyra agreed to the robbery but said he would have nothing to do with murder. Fritchie then suggested making McMurtry's death look like an accident in the bathtub; Tyra again refused to join in the murder. The two decided to return that evening to rob McMurtry. Tyra telephoned the victim to apologize for the argument that morning and obtained McMurtry's permission for him and Fritchie to return. They found McMurtry on his bed, wearing only a shirt and socks. Tyra's testimony continued: "I was sitting on the couch and Danny walked over to the bed and sat down and said, 'Mac, what would you do if I gave you a kiss?' . . . Mr. McMurtry said that if it was a kiss of friendship that would be fine, and Danny reached over to kiss him and then grabbed him around the throat and started choking him." When McMurtry resisted, Tyra walked over to the bed and held down the victim's hands. "I held him there and Danny picked up a statue that was sitting on the table by the bed and started hitting Mr. McMurtry on the head with it. . . . It finally crumbled. He laid it down. There was a knife laying on the table also by the bed, [and Fritchie] reached over, grabbed the knife and stabbed him in the neck with it and pushed it upwards toward the brain. . . . Then he stuck the knife back into the same wound and up towards the head and started twisting it and sit there laughing." Tyra went on to say that a short time later Fritchie gave him a pair of gloves and instructed him to wipe down the apartment for fingerprints. They then divided about $800 of McMurtry's money and left the apartment.

Testimony of other witnesses tended to corroborate Tyra. A witness testified that Fritchie had no money on the morning of March 8 but that on the night of the 8th Fritchie reappeared in new clothes, brandishing cash and inviting friends to come with him to Disneyland. Other testimony showed that Fritchie had asked to borrow gloves shortly before the murder. Fritchie had told one witness that Tyra committed

the murder while Fritchie "went out for cokes." Finally, a note from Fritchie to Tyra's wife introduced in evidence reads: "John [Tyra] killed Mr. McMurtry. That is how we got the $800. Now John is threatening to tell the police I did it. I did not. John did. I was there and saw John kill him."

Apart from Tyra's testimony, the evidence most probative of the fact that Fritchie and not Tyra killed McMurtry was Fritchie's hand-written confession to the 1970 Florida murder, which was admitted in evidence over defense objection as proof of a common identity of the California and Florida murderers. The Florida victim was a middle-aged homosexual living alone who was killed in bed while partially naked. The murder weapons were kitchen knives and an iron skillet found in the victim's apartment. Like McMurtry, the Florida victim was repeatedly hit on the head and stabbed in the neck. After the Florida murder, Fritchie carefully wiped down the victim's apartment, even though he immediately turned himself over to the police. The name of the Florida victim was McCambridge.

In cross-examining Tyra, Fritchie's counsel brought out that Tyra knew some of the details of the Florida murder. In summation, the defense argued that Tyra committed the murder and arranged the evidence to resemble Fritchie's earlier crime. Fritchie did not take the stand. As its only

witness, the defense called a California police officer to impeach Tyra's testimony on a narrow collateral subject. There was no offer either of the absolute defense of insanity or of the partial defense of diminished capacity tending to negate the specific-intent elements of robbery and murder under California law.

## I. Admissibility of Florida Confession

At the conclusion of a pre-trial suppression hearing on the circumstances surrounding the Florida confession, the California trial court ruled that Fritchie had confessed in Florida after a knowing and intelligent waiver of his rights, and that his confession was "in all respects voluntary." At trial, the court admitted the confession as "identity" evidence under Cal.Evid.Code § 1101(b), and this ruling was upheld by the California Court of Appeal. The evidence question is a matter of state law and is not under review here.[1] *Lisenba v. California,* 314 U.S. 219, 228, 62 S.Ct. 280, 286, 86 L.Ed. 166 (1941); *Salemme v. Ristaino,* 587 F.2d 81, 85 (1st Cir. 1978); *Mercado v. Massey,* 536 F.2d 107, 108 (5th Cir. 1976); *Schleicher v. Wyrick,* 529 F.2d 906, 911 (8th Cir. 1976).

Fritchie's petition for habeas corpus does not allege any improper conduct by the Florida police in obtaining the confession. Rather, he claims that despite the absence of any coercion, the confession was involuntary because it was made while he was insane. The issue thus on review is wheth-

---

1. Cal.Evid.Code § 1101(b), substantially similar to F.R.Evid. Rule 404(b), provides as follows:

 Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts.

 The appellant cites many cases disapproving the use of prior crimes in federal prosecutions. *See, e. g., Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948); *Hall v. United States,* 150 U.S. 76, 14 S.Ct. 22, 37 L.Ed. 1003 (1893); *Boyd v. United States,* 142 U.S. 450, 12 S.Ct. 292, 35 L.Ed. 1077 (1892); *Enriquez v. United States,* 314 F.2d 703 (9th Cir. 1963); *Sang Soon Sur v. United States,* 167 F.2d 431 (9th Cir. 1948). In all these cases,

 appellate courts were acting in their supervisory role over the federal system of criminal justice or were construing rules of evidence for the federal courts. The scope of review is narrower when federal courts review state proceedings for their validity under the U. S. Constitution. The Supreme Court has explicitly held that a state practice of permitting a jury to hear evidence of prior crimes does not violate the due process clause of the Fourteenth Amendment, at least where the trial judge gives a limiting instruction. *Spencer v. Texas,* 385 U.S. 554, 561, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967). Here the trial judge instructed the jury that evidence of the Florida murder "was received and may be considered by you only for the limited purpose of determining if it tends to show the identity of the person who committed the crime, if any, of which the defendant is accused."

er the record in the state court suppression hearing, considered as a whole, fairly supports the court's conclusion that appellant's mental state did not render the confession involuntary. If so, this court must determine whether appellant has established by convincing evidence that the trial court's determination of the factual issue was erroneous. We hold that the court's conclusion of appellant's voluntary confession is so supported by the record, and appellant has not met his burden of proving the error of that determination.

Before turning to an examination of the record, we must emphasize the limited scope of review permitted by this habeas petition. Under the relevant portion of the habeas statute, 28 U.S.C. § 2254(d), a state factual determination rendered after a hearing on the merits is to be presumed correct unless the federal reviewing court concludes that the "record in the State court proceeding, considered as a whole, does not fairly support such factual determination." When the presumption of correctness is operative, the "burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous."

■ The Supreme Court, in *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), stressed the deferential import of the above standard for the federal judiciary when reviewing the state fact finding process on habeas. The Court stated that the "interest in federalism recognized by Congress in enacting § 2254(d)," *id.* at 769, requires a "presumption of correctness" of state factual determinations, *id.* "Congress meant to insure that a state finding not be overturned merely on the basis of the usual 'preponderance of the evidence' standard in such a situation." *Id.* at 771. To guarantee faithful adherence to the Congressional mandate, the Court in *Sumner* directed that federal habeas courts grant the writ if, and only if, they set forth with some specificity the factual basis upon which they believed the general requirements of § 2254(d) had been met.

This court, thus reviewing the district court's denial of the writ, must examine the state court determination of voluntariness in light of the Supreme Court's mandate in *Sumner*. On the record before us and for the reasons set forth below, we find that the writ cannot issue.

■ The California trial court's finding of "voluntariness" followed an extensive pre-trial suppression hearing, wherein the evidence presented focused on defendant's mental state at the time of his confession.[2] Officer Witt, the Miami policeman who came to the scene of the 1970 murder in response to Fritchie's call, testified that he arrived at 1:15 a. m. on May 24, 1970, and that Fritchie led him to the room where the victim's body lay and readily admitted the killing. After making arrangements for other officers to take charge at the murder scene, Witt took Fritchie to the police station. There, at 2:50 a. m., Fritchie signed a police form waiving his constitutional rights, and at 3:00 a. m. he wrote out the confession under review here in longhand on two sheets of yellow legal-size paper. The first two sentences were dictated by a police officer and read as follows: "I, Daniel Fritchie, was advised of my constitutional rights by Sergeant Giordano in the presence of Sergeant Witt and Officer C. Wells, and I completely understand it [sic], and have signed a form to this effect. And everything I write on this pad will be free and voluntary on my part." Fritchie wrote the balance of the statement in his own words.

There were no allegations of improper conduct by the Florida police in obtaining the confession. Thus, the issue obviously raised was whether Fritchie's mental health precluded his confession from being the "product of any meaningful act of volition," *Blackburn v. Alabama*, 361 U.S. 199, 211, 80 S.Ct. 274, 282, 4 L.Ed.2d 242 (1960), or the

---

**2.** The transcript of the California suppression hearing contains virtually all the evidence in the record of the circumstances surrounding the Florida confession. Efforts to obtain a rec-

ord of any Florida determination of voluntariness were unavailing; it is probable that the issue was never decided by the Florida court.

"'product of a rational intellect and a free will,'" *Townsend v. Sain,* 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963).

Although conceivably a different trial court might disagree with the California court's conclusion of voluntariness, we cannot say that its judgment was not fairly supported by the record—"a judgment which must by its nature always be one of probabilities." *Blackburn, supra,* 361 U.S. at 208, 80 S.Ct. at 281.

## II. Waiver of Rights

 Before writing out his Florida confession, the appellant signed a police form waiving his right to counsel. He now argues that this waiver was ineffective because it was not made knowingly and intelligently, and that the use of the confession was therefore a violation of his Sixth Amendment right to counsel. This argument is without merit, since the Sixth Amendment attaches only upon the initiation of adversary judicial criminal procedures. *Moore v. Illinois,* 434 U.S. 220, 226–27, 98 S.Ct. 458, 463–464, 54 L.Ed.2d 424 (1977); *Kirby v. Illinois,* 406 U.S. 682, 689–90, 92 S.Ct. 1877, 1882–1883, 32 L.Ed.2d 411 (1972) (plurality opinion). The waiver of the right to counsel required by *Miranda v. Arizona, supra,* is derived not from the Sixth Amendment but from the Fifth Amendment's protection against self-incrimination. *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981). If the right to counsel under *Miranda* is once invoked, any subsequent waiver must be analyzed separately from the question of voluntariness. *Id.* But where, as here, the appellant never invoked the right to counsel, there is no occasion for the discrete inquiry into the effectiveness of the waiver required by *Edwards v. Arizona, supra.*

## III. Competence of Counsel

 Appellant's final claim is that he was deprived of his Sixth Amendment right to the effective assistance of counsel because the Deputy Public Defender representing him in the California trial failed to present a defense on the basis of diminished capacity. Fritchie was convicted of armed robbery and first degree (felony) murder, for which robbery was the underlying crime. The specific intent permanently to deprive the owner of his property is a necessary element of all degrees of robbery. *People v. Morlock,* 46 Cal.2d 141, 292 P.2d 897 (1956) (en banc); *People v. Sanchez,* 35 Cal.2d 522, 219 P.2d 9 (1950). *See* CALJIC No. 9.10 (4th Ed.). A psychiatrist who examined Fritchie in the Los Angeles County Jail while he was awaiting trial concluded, in an eight-page report, that Fritchie "did not have the mental capacity to form the specific intent to murder and to specifically deprive the owner of property permanently. He did not have the capacity to deliberate, to premeditate, harbor malice, nor to meaningfully and maturely to [sic] reflect upon the gravity of his contemplated acts." The appellant's petition alleges that he told defense counsel on several occasions before trial of his desire to present a diminished capacity defense, but that counsel refused.

This court en banc has decided that a state conviction may be invalidated through federal habeas corpus upon a finding that the defendant was deprived of "reasonably effective and competent defense representation" and that he was prejudiced thereby. *Cooper v. Fitzharris,* 586 F.2d 1325 (9th Cir. 1978) (en banc). The touchstone for a defendant's right to effective counsel is whether he received a fair trial. *United States v. Altamirano,* 633 F.2d 147, 152–53 (9th Cir. 1980); *Brubaker v. Dickson,* 310 F.2d 30, 37 (9th Cir. 1962). The parties cite only two cases tending to support federal habeas on the grounds of ineffective defense representation. In both, the court found that defense counsel had failed to investigate and prepare available defenses. *Davis v. Alabama,* 596 F.2d 1214 (5th Cir. 1979); *Brubaker v. Dickson, supra.* Here, however, Fritchie concedes that trial counsel had fully investigated the diminished capacity defense. Moreover, our study of the record shows that defense counsel in general acted as a vigorous and thorough advocate.

An affidavit obtained by the U. S. Magistrate from Fritchie's trial counsel explains that a tactical choice was made to attempt to persuade the jury that Tyra, not Fritchie, was the perpetrator of the robbery and murder. The diminished capacity defense, according to counsel's affidavit, would have undermined this strategy. Although the tactical choice may seem unwise in hindsight, it was not so unreasonable as to constitute denial of a constitutional right to effective assistant of counsel. *United States v. Stern*, 519 F.2d 521, 524 (9th Cir. 1975); *United States v. Wilkes*, 449 F.2d 163 (9th Cir. 1971); *Smith v. United States*, 446 F.2d 1117, 1119 (9th Cir. 1971). *See also Brubaker v. Dickson, supra*, 310 F.2d at 32.

The judgment of the district court is AFFIRMED.