**UNITED STATES of America, Plaintiff,**

**v.**

**Laurence John LAYTON, Defendant.**

**No. CR–80–416 RFP.**

United States District Court,
N.D. California.

June 3, 1987.

See also 632 F.Supp. 176.

Joseph P. Russoniello, U.S. Atty., San Francisco, Cal., for plaintiff.

Robert R. Bryan, Thomas W. Jackson, San Francisco, Cal., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW DENYING MOTION UNDER 28 U.S.C. § 2255

PECKHAM, Chief Judge.

### INTRODUCTION

The defendant in this case has filed a motion under 28 U.S.C. § 2255 to vacate and set aside his conviction on the ground that he was denied the effective assistance of counsel during his second trial.[1] The court denies the motion.

### PROCEDURAL BACKGROUND

On October 9, 1980, the defendant Laurence John Layton was indicted on the following four counts: (1) conspiracy to murder Congressman Leo Ryan in violation of 18 U.S.C. § 351(d); (2) aiding and abetting the murder of Congressman Leo Ryan in violation of 18 U.S.C. §§ 2, 351(a); (3) conspiracy to murder an internationally protected person, Richard Dwyer, Deputy Chief of Mission for the United States in the Republic of Guyana, in violation of 18 U.S.C. § 1117; and (4) aiding and abetting the attempted murder of an internationally protected person (Dwyer) in violation of 18 U.S.C. §§ 2, 1116(a). In 1981, the defendant was tried before a jury on all the charges. The defense rested without calling any witnesses or putting the defendant on the stand, arguing to the jury that the government had simply failed to prove its case. On September 26, 1981, this court declared a mistrial because the jury was deadlocked eleven-to-one for acquittal on the conspiracy charges and seven-to-five for conviction on the aiding and abetting charges.

After two appeals by the government on evidentiary issues, a second trial on the same charges commenced on October 9, 1986. The defendant was represented at the trial by three attorneys: Tony Tamburello; James Hewitt, Federal Public Defender for the Northern District of California; and Marianne Bachers. All three of these attorneys had also been on the defense team during Layton's first trial in 1981. The defense team during the second trial also included two research assistants or paralegals, John Riddiough and Melissa Frink. At the second trial, the defense

---

**1.** This motion was originally filed on January 23, 1987 as an amended motion for new trial. However, because the amended motion for new trial was not timely filed, *see* Fed.R.Crim.P. 33, and because the motion was more in the nature of a collateral attack on the conviction, this court has treated it as a motion under 28 U.S.C. § 2255.

again decided to rest without calling any witnesses or putting the defendant on the stand. On December 1, 1986, the jury returned a verdict of guilty on all four counts. On March 3, 1987, this court sentenced the defendant to concurrent sentences of life in prison on Count 2 and fifteen years in prison on each of the other counts. The court recommended that the defendant be considered for parole after five years.

The defendant now contends that he was deprived of the right to effective assistance of counsel under the Sixth Amendment to the United States Constitution. Layton, through his new counsel, argues that his defense was constitutionally inadequate for two reasons: (1) his defense counsel failed to inform him that Count 2 of the indictment carried a mandatory sentence of life imprisonment; and (2) his defense counsel failed to present a psychiatric defense to the charges. This court held an evidentiary hearing on the motion from April 21, 1987 to April 30, 1987.

## FINDINGS OF FACT

### 1. Failure to Inform Defendant of Mandatory Life Sentence

Throughout the proceedings in this case, the defense team was under the impression that the first three counts of the indictment carried sentences of any term of years to life, and that the fourth count carried a sentence of any term of years to twenty years. (Tr. 1:18).[2] The defense team also informed the defendant that, in the event of a guilty verdict, the court would have the discretion to sentence him to anything from probation to life imprisonment. (Tr.

7:979; 7:1002). On January 6, 1987, over a month after the conviction, Tamburello learned through Senior United States Probation Officer Loren Buddress that Count 2 of the indictment carried a mandatory life sentence, and that the court had no discretion to impose a lesser sentence.[3] (Tr. 1:18; 5:584–86). Tamburello and Hewitt immediately informed the court of the error, and requested that independent counsel be appointed to investigate whether it had any effect on the outcome of the case. (Tr. 1:20–1:21). After independent counsel was appointed by the court, Layton decided to retain another attorney of his own choosing, who filed this motion alleging ineffective assistance of counsel. (Tr. 1:21; 7:980–81).

At the evidentiary hearing on this matter, Layton testified that, had he known of the mandatory life sentence under Count 2 of the indictment, he would have insisted on testifying and on presenting a psychiatric defense. Layton further testified that he would have brought the matter to the court's attention if his lawyers refused to put on a defense. (Tr. 7:983–84). According to Layton, he thought that the psychiatric information could be presented at the penalty stage of the case in order to convince the court to exercise its sentencing discretion leniently. (Tr. 7:1003). Had he known that the court lacked the power to exercise any discretion, he claims, he would have insisted on presenting a psychiatric defense at the trial. (Tr. 7:984).

For several reasons, the court finds that this testimony is not believable. First of all, Layton made several untruthful statements at the evidentiary hearing which ser-

---

**2.** Citations to "Tr." refer to the transcript of the evidentiary hearing on this motion held April 21, 1987 to April 30, 1987. The citations are by volume and page number. Citations to "Exh." refer to exhibits introduced at the evidentiary hearing.

**3.** 18 U.S.C. §§ 2 and 351 provide that a person convicted of aiding and abetting the first degree murder of a member of Congress shall be punished as set forth in 18 U.S.C. § 1111(b). 18 U.S.C. § 1111(b), in turn, provides for a punishment of death "unless the jury qualifies its verdict by adding thereto 'without capital punishment', in which event [the defendant] shall be

sentenced to imprisonment for life." Since this statute was enacted, the provision for capital punishment has been declared unconstitutional in the wake of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (per curiam). "[W]ith death in effect struck out of the statute, life is the only punishment possible. There is no ambiguity in the statute that would give the district court ... [the discretion to allow] a term of years to be imposed instead." *United States v. Fountain,* 768 F.2d 790, 800 (7th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1647, 90 L.Ed.2d 191 (1986).

iously undermined his credibility as a witness. For example, Layton accused defense paralegal Riddiough of fabricating a conversation in which Layton told Riddiough that he had made up the story about taking the drug Elavil on the day of the shootings. (Tr. 7:1090; 7:1104). Layton also accused Riddiough of fabricating a conversation in which Layton stated that he viewed Congressman Ryan as a "troublemaker." (Tr. 7:1013). Layton denied making these statements to Riddiough despite the fact that Riddiough kept contemporaneous notes of the conversations in which the statements are clearly recorded. *See* Exh. P–38 at 4; P–39 at 2. In addition, Layton flatly contradicted defense paralegal Frink's testimony that Layton told her and Bachers on the day of the conviction that he thought he was subject to a life sentence without the possibility of parole. (Tr. 7:1060; 7:1127). The court was impressed with the sincerity and candor of both Riddiough and Frink, and can find no reason to disbelieve their testimony. By contrast, Layton was not a persuasive witness, and he clearly had ample incentive to distort the truth.

Second, it is simply illogical to suggest that the distinction between a mandatory life sentence and a discretionary life sentence could have played any significant role in Layton's decision whether to testify or insist on presenting a psychiatric defense. Layton was fully aware of the seriousness of the charges against him in this case, and of the potential for a heavy sentence. Tamburello testified that during the first trial he informed Layton the sentence would be severe if he were convicted, and that Layton could expect to receive life in prison. (Tr. 3:385). Frink also testified that the defense team "always spoke about the penalty in terms of the maximum life." (Tr. 7:1129). In an in-chambers proceeding after the government rested at the first

trial, this court itself instructed the defendant that he could face life imprisonment if found guilty of the charges. *See* Exh. D–10 at 5388–89.[4] Layton's counsel also informed him that a sentence of a term of years could mean *more* than a life sentence if the term of years was set high enough. (Tr. 4:393). Thus, Layton had ample incentive to present as vigorous a defense as possible, regardless of whether the sentence was discretionary life or mandatory life.

Furthermore, the record is replete with evidence that Layton himself was adamantly opposed to a psychiatric defense, and that he was insistent on not testifying. Tamburello testified that Layton was against testifying or presenting psychiatric evidence, and that he was even reluctant to talk to a defense psychiatrist. (Tr. 1:60–61; 1:77). Prior to and during the second trial, the entire defense team was engaged in a concentrated effort to overcome Layton's resistance to testifying. (Tr. 1:105). According to Riddiough, Layton was "adamant that he would not even consider the idea of testifying" (Tr. 5:715), and Layton "was very opposed to a psychiatric defense." (Tr. 5:725). Riddiough's contemporaneous handwritten notes of conversations with Layton clearly reflect Layton's hostility to testifying or presenting a psychiatric defense. According to Riddiough's notes, Layton did not think a psychiatric defense would work, and did not believe he was crazy or mentally ill. (Exh. P–39 at 2). At one point, Layton stated that he had decided not to testify and did not think anything could change his mind. (Exh. P–39 at 9). In light of this record, it begs credulity to suggest that Layton would ever have insisted on testifying or presenting a psychiatric defense.

In addition, there is no evidence in the record, aside from Layton's conclusory and

---

**4.** The purpose of this in-chambers proceeding after the government's case at the first trial was to ascertain whether Layton was freely and voluntarily waiving his right to present a defense at trial. The court informed the defendant that he had a right to subpoena witnesses and to testify on his own behalf. The court further informed the defendant that over $30,000 had been autho-

rized to obtain expert psychiatric testimony for the defense, and that the jury could acquit him on the basis of an insanity defense. Layton indicated that he had fully discussed the matter with all of his attorneys, that he was satisfied with the representation he had received, and that he was fully aware of the risks of not presenting an insanity defense. *See* Exh. D–10.

self-serving statements, that the potential sentence ever affected Layton's opinion on the appropriate trial strategy. In none of the handwritten notes of Riddiough's conversations with Layton is there any suggestion that the sentence was a significant factor in Layton's mind. In fact, Tamburello testified that no reference to penalty was ever made in any of the discussions about Layton testifying or about presenting a psychiatric defense. (Tr. 1:89). The fact that Layton did not attach great significance to the potential penalty is further illustrated by his confusion on the day of conviction, when he stated to Frink and Bachers that he thought he was subject to a life sentence without the possibility of parole. (Tr. 4:439; 5:740; 7:1127). There is simply nothing in the record to substantiate Layton's claim that the potential sentence had any bearing on his opposition to testifying or presenting an affirmative defense.

Finally, the court finds that knowledge of the mandatory life sentence would not have affected the defense team's decision not to put Layton on the stand or present a psychiatric defense. Tamburello testified that, in any criminal case, he makes strategic decisions based upon the worst possible consequences. (Tr. 1:89). He stated: "Our strategy was to win, and we based our decisions on the fact that we wanted to win the case.... Whenever I am in a case where there is a range of sentence, I always take the attitude that you always look at the worst possible sentence as the basis on which you make your decisions." (Tr. 4:396). The only evidence that the strategy would have been different if the defense team had known of the mandatory life sentence is the testimony of Layton's sister, Deborah Layton Cartmell. Cartmell testified that Tamburello told her "he would have proceeded completely differently" had he known of the mandatory sentence. (Tr. 7:938). However, Cartmell's testimony in its entirety was not credible. Cartmell accused the defense team of lying

about certain facts that are both true and undisputed.[5] Furthermore, Cartmell also testified that the defense team informed her the potential sentence was probation to a term of years, and that a life sentence was never mentioned. (Tr. 7:969). This testimony is inconsistent with the testimony of every other witness, including Layton himself. These false assertions, and Cartmell's emotional involvement in the case, lead the court to attach little weight to her testimony.

In conclusion, the court finds that knowledge of the mandatory life sentence would not have affected the trial strategy in this case. The court does not believe that Layton would have insisted on testifying or presenting a psychiatric defense if he had known of the mandatory life sentence. The court does believe the testimony of the defense team that the mandatory sentence would not have affected their decisions in trial. Finally, it is worth noting that there was never any plea bargain offered to the defense in this case, and there has been absolutely no showing that any plea other than a plea of guilty to all counts would have been acceptable to the government. (Tr. 1:79).

### 2. Failure to Present a Psychiatric Defense

It is clear beyond dispute that the defense team in this case did fully investigate and prepare a psychiatric defense to the charges in the indictment. The defense team was prepared to call two psychiatrists and a psychologist, each of whom had examined Layton and concluded that Layton was suffering from a mental disease that rendered him unable to appreciate the wrongfulness of his behavior or to conform his conduct to the requirements of the law. See Exh. D-6 (Report of Dr. Philip G. Zimbardo); Exh. D-8 (Report of Dr. John G. Clark); Exh. D-9 (Report of Dr. Emanuel Tanay). In addition, the defense team consulted with a fourth expert who prepared a

---

5. For example, Cartmell accused the defense team of making up the story that Layton admitted to a psychiatrist that he volunteered to blow up the plane and suggested to Jim Jones that

dynamite be used. (Tr. 7:967–68). In fact, it is undisputed that Layton did make these statements in a taped interview with a psychiatrist in February 1979. (See Exh. P-6 at 20–21).

"psychiatric autopsy" of Jim Jones, and who might have testified that Layton suffered from "shared paranoid disorder." *See* Exh. P–31 (Preliminary Report of Dr. Otto L. Bendheim). Several other psychiatrists and psychologists were also contacted in preparation for a psychiatric defense. (Tr. 5:605–606).

The defense team communicated with their psychiatric experts about the legal theories being developed in the case, *see, e.g.,* Exh. P–27 (Memorandum to Defense Experts), and they kept each other fully apprised of their own work and research on the psychiatric defense, *see, e.g.,* Exh. P–16 (Memorandum Re Psychiatric Defense). Riddiough testified that he alone devoted approximately 800 hours to the psychiatric defense between November 1985 and August 1986. (Tr. 5:603). The defense investigators, Palladino & Sutherland, generated over 1100 pages of interviews with lay witnesses, *see* Exh. P–34, P–42, many of whom the defense was prepared to call in support of a psychiatric defense. (Tr. 1:40–60). In sum, the record clearly indicates that the defense carefully and conscientiously investigated and prepared a psychiatric defense to the charges in this case. Furthermore, the defense team remained open to the possibility of a psychiatric defense until the very end of the government's case in the second trial. On the Sunday before the government rested, the defense team met and came to a tentative decision not to go forward with the psychiatric defense. (Tr. 1:76). The defense team again discussed the issue after the government's last witness, and then came to a final decision not to put on any affirmative defense. (Tr. 1:77). This decision was arrived at by consensus of all counsel (Tr. 1:76–77), and with the agreement of Layton himself (Tr. 7:1028).

Before turning to the reasons that the defense rested without putting on an affirmative defense, it must be emphasized that the defense team did vigorously pursue an alternative strategy for obtaining an acquittal. The defense strategy at the second trial, as well as the first, was to argue that: (1) Layton was acting independently of the other conspirators who shot at Congressman Ryan and his party; (2) Layton's actions were directed solely at the defectors leaving Jonestown; and (3) Layton lacked the specific intent to harm or kill Congressman Ryan or Deputy Chief of Mission Dwyer. (Tr. 1:70; 2:223–24). The defense attorneys attempted to establish these facts through extensive cross-examination of each of the government's own witnesses. In closing argument, the defense argued that there were, at the very least, equally reasonable inferences of guilt and innocence that could be drawn from the government's circumstantial evidence, and that the jury was required to adopt the inference of innocence under the instructions given to them by the court. (Tr. 1:70). Thus, Layton's attorneys did not simply abandon their client without pursuing any form of defense; rather, they chose to argue that the government had simply failed to prove its case.

In deciding to pursue this strategy rather than a psychiatric defense, the defense attorneys had the benefit of their experience in the first trial. As a result of the verdict at the first trial, and the post-trial interviews with the jurors, the defense team clearly had a reasonable basis for thinking that their strategy might succeed. A number of the jurors expressed strong opinions that the government had simply failed to link Layton to the conspiracy charged. *See* Exh. D–2 (Interview of Juror Powers at 2; Interview of Juror Miller at 13; Interview of Juror Lobers at 19; Interview of Juror Thom at 33). One juror stated that he had told the prosecutors after the trial that "they ought to find more boards for their house—the conspiracy charge won't float without harder evidence." *Id.* (Interview of Juror Thom at 30). At these interviews, the defense team was also able to find out what caused some of the jurors to favor conviction, and they attempted to respond to these concerns during cross-examination of the government witnesses at the second trial. Thus, when the government rested, the defense attorneys actually thought that the second trial had gone better for Layton than the first. (Tr. 1:109; 2:132).

The defense investigators' interviews with the first jurors also suggested that a psychiatric defense would not have been helpful. Several jurors stated that they thought psychiatric evidence would only have "confused" the issues, and would not have aided them in their deliberations. *See* Exh. D–2 (Interview of Juror Powers at 6; Interview of Juror Miller at 16; Interview of Juror Thom at 38). Although one juror did state that more testimony about Layton's state of mind would have been helpful, even she was of the opinion that psychiatric testimony from doctors would not have swayed her. *Id.* (Interview of Juror Lober at 20, 27). Thus, viewed collectively, the interviews of jurors from the first trial reflect a rather strong endorsement of the defense team's strategy.

In addition to these interviews, the defense team had many other reasons for deciding against a psychiatric defense, each of which requires substantial explanation. First, Layton made a number of damaging statements during taped interviews with psychiatrists and psychologists who would have been called at the trial. Layton told Dr. Clark that he had been instructed to shoot the pilot of the plane, or, if there were more than one plane, to shoot the pilot of the first plane. (Tr. 1:66). As Tamburello testified, this statement was problematic because it indicated that Layton was prepared to shoot down the plane whether or not Ryan and Dwyer were on it. (Tr. 1:66). Layton also told Dr. Clark that he had second thoughts about going through with the plan when he reached the airstrip at Port Kaituma. (Tr. 3:377; 5:660). The defense team was concerned that this statement indicated independence of thought that would undermine a psychiatric defense. (Tr. 5:660). In addition, Layton told Dr. Lunde, the government psychiatrist, that he had suggested to Jim Jones that dynamite be used to take down the plane. The defense team worried that this prejudicial statement also showed ability to reason and independence of thought. (Tr. 2:155). Furthermore, Layton told Dr.

Tanay that he had smoked marijuana in jail just before his psychiatric interview, which the defense worried would not be favorably viewed by the jury, and might cast doubt on the psychiatric analysis. (Tr. 5:631). Finally, Layton had revealed to Dr. Bendheim that he had sexual relations with Jim Jones, which was a source of great embarrassment to Layton himself. (Tr. 5:621).[6]

The most damaging statements made by Layton were contained on tapes of several interviews with Dr. Hardat Arjune Sukhdeo. In those interviews, which took place in February 1979 and May 1980, Layton told Dr. Sukhdeo that he initially volunteered to blow up the plane with dynamite, but Jim Jones refused. Then, Layton said, he offered to take down the plane with a gun, but Jones refused again. However, about twenty minutes later, Maria Katsaris, a top aide to Jones, came to Layton and instructed him to carry out the plan. According to Layton's statements in the Sukhdeo interview, he expected everyone, including Congressman Ryan, to be on the plane that he shot down. *See* Exh. P–6 at 20–22; Exh. P–5 at 9–10.

Because Layton's statements to Dr. Sukhdeo implicated him in a conspiracy with Jim Jones and/or Maria Katsaris to kill Congressman Ryan, the defense team early on decided not to use Dr. Sukhdeo as an expert psychiatric witness. (5:698–99). Furthermore, the statements Layton made to Dr. Sukhdeo were never revealed to the other psychiatrists and psychologists who might have been called on Layton's behalf. (Tr. 5:698). For two reasons, however, these tapes still posed a problem for the defense team. First, even though the defense had successfully resisted the government's efforts to discover the Sukhdeo tapes, there was reason to believe that the government had independently obtained copies. Layton told his defense lawyers that some of the statements attributed to him by the government psychiatrist, Dr. Lunde, were not in fact made by him. In particular, Layton denied having told Dr.

---

6. Under Fed.R.Evid. 705, Layton's statements to expert psychiatrists might have been disclosed to the jury even if not brought out on direct examination. Rule 705 provides that an expert may be required to disclose the facts underlying his opinion on cross-examination.

Lunde that he suggested using dynamite to bring down the plane, even though the statement is included in Dr. Lunde's report. *See* Exh. P–40 at 8. Because this statement was similar to a statement made by Layton to Dr. Sukhdeo, the defense team feared that the government might somehow have obtained copies of the Sukhdeo tapes and would use them to impeach the defendant or to undermine a psychiatric defense. (Tr. 5:697; 2:229).

Second, the Sukhdeo tapes also posed an ethical dilemma for the defense team. Layton could have taken the stand to testify that he had never suggested using dynamite, and that Dr. Lunde had fabricated that statement in his report. However, the Sukhdeo tapes revealed that Layton did in fact suggest using dynamite. Thus, if Layton had so testified, his defense lawyers feared that they might have an ethical obligation to reveal their client's perjury to the court and/or withdraw from the case. (Tr. 2:226–230). *See Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) (stating that a lawyer's ethical duties include revealing a client's perjury to the court). Furthermore, if Layton had taken the stand and testified that he only intended to kill the defectors, or that he never volunteered for the assignment, his lawyers would have been confronted with the same ethical dilemma, especially in light of Layton's admissions to Riddiough that he had in fact volunteered, and that he viewed

Ryan as a troublemaker. *See* Exh. P–39 at 2.[7]

In addition to the problems involving Layton's statements to psychiatrists and psychologists, the defense team was also concerned about the substance of the psychiatric testimony. First of all, each of the defense experts had arrived at a different diagnosis of Layton's mental condition in their psychiatric reports. (Tr. 1:63–65; 5:629). Although the experts all agreed that Layton suffered from a mental disease which rendered him unable to appreciate the wrongfulness of his behavior or to conform his conduct to the requirements of the law, the defense team was concerned that the experts would be precluded from rendering this ultimate opinion under Fed.R. Evid. 704(b). (Tr. 5:627–630).[8] If the experts were prevented from voicing their ultimate opinions that Layton was legally insane at the time of the events, then they could only have testified as to their diagnoses of Layton's mental condition. Because these diagnoses differed from each other, the defense team worried that the jury would discount their expert psychiatric testimony. (Tr. 1:63). Furthermore, the defense team also had misgivings that Dr. Clark's diagnosis of borderline personality disorder was insufficient to satisfy the standards for legal insanity. (Tr. 5:657). Finally, the defense also took into account the fact that a government psychiatrist who had examined Layton would testify

---

7. To the extent that a psychiatric defense would have relied upon the fact that Layton claimed to have taken the drug Elavil on the day in question, the defense faced a similar ethical dilemma. In the February 1979 interview with Dr. Sukhdeo, Layton stated that he had taken Elavil before the day of the shootings, but that the medication he took on that day was one he had never had before. *See* Exh. P–5 at 20–21. Furthermore, Layton later told Riddiough that he had made up the story about taking Elavil while in his jail cell in Guyana. (Tr. 5:681; Exh. P–38 at 4). Thus, if Layton were to testify in support of a psychiatric defense that he had taken Elavil on the day of the shootings, the defense attorneys feared that they would have to reveal his perjury to the court. (Tr. 2:218). Furthermore, Layton's numerous contradictory statements regarding his use of Elavil on the day in question seriously undermined the viability of any drug-related insanity defense.

8. Fed.R.Evid. 704(b) provides: "No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone." Although Rule 704 was not in effect at the time the crimes in this case were allegedly committed, it would still have been applied in Layton's 1986 trial. *See United States v. Alexander,* 805 F.2d 1458, 1461–62 (11th Cir.1986) (holding that retroactive application of Rule 704(b) does not violate the constitutional prohibition against *ex post facto* laws); *United States v. Prickett,* 790 F.2d 35, 37 (6th Cir.1986) (same); *United States v. Mest,* 789 F.2d 1069 (4th Cir.) (same), *cert. denied,* —— U.S. ——, 107 S.Ct. 163, 93 L.Ed.2d 102 (1986).

that Layton was not legally insane on the day of the events. (Tr. 1:38; Exh. P–40 at 9) (Report of Dr. Donald Lunde).[9]

Several other considerations entered into the defense team's decision not to put on a psychiatric defense. First, they considered the negative public reaction to psychiatric defenses in the cases of John Hinckley and Dan White, and the statements of some jurors during *voir dire* that they did not put much faith in psychiatric evaluations years after the event. (Tr. 1:29). Second, Layton's attorneys took into account Layton's own adamant opposition to the psychiatric defense, although they recognized that the decision was ultimately theirs and not his. (Tr. 1:60; 5:726).[10] Third, the defense lawyers also considered the fact that a successful psychiatric defense would result in Layton's commitment to a mental institution for an indefinite period of time, whereas the strategy pursued at the first trial had persuaded many of the jurors to vote for an outright acquittal on all counts. (Tr. 1:75; 5:677). Finally, the defense team was able to elicit much testimony on Layton's state of mind during cross-examination of the government's witnesses (Tr. 1:98–99), and the jury was instructed that this testimony could be considered in determining whether Layton had the specific intent for the offenses charged. (Trial Transcript at 30–4424).[11] Thus, psychiatric evidence from lay witnesses was presented to the jury without risking the perils of a full-blown insanity defense.

In sum, the defense attorneys in this case had many reasons for not putting on an insanity defense. Only one expert legal witness, former Attorney General Ramsey Clark, testified that the failure to present a psychiatric defense constituted ineffective assistance of counsel.[12] Clark testified that, "unless there was reasonable basis for trial counsel to believe that there was not even a prima facie case" for the insanity defense, "there was an absolute duty to the client to put this defense on as vigorously as possible." (Tr. 3:298). However, Clark's testimony revealed that he was not familiar with the particular facts of this case, and was not aware of the many reasons that prompted the defense to rest without an insanity defense. Although Clark glibly discounted the statements Layton made to psychiatrists as the product of a crazy mind, there is no guarantee that a jury would have accepted such an explanation. The defense attorneys were legitimately concerned that Layton's statements to psychiatrists would totally undermine their argument that his actions were directed solely at the defectors. (Tr. 1:29).

9. The defense team was also aware that Dr. Lunde had spoken with a jail physician from Guyana, Dr. Wharton, who told Dr. Lunde that he observed Layton in the Guyana jail for two years and that Layton "seemed perfectly normal" to him. *See* Exh. P–35. The government apparently intended to offer this statement in evidence to contradict any defense testimony that Layton was acting strangely after the shootings. (Tr. 4:488).

10. The American Bar Association Standards Relating to the Administration of Criminal Justice require that certain decisions relating to the conduct of a case be made by the accused, and other decisions be made by the defense counsel. One of the decisions for the accused is whether to testify in his own behalf. The decision whether to call witnesses or put on a particular affirmative defense is one for defense counsel to make after consultation with the client. *See* Standard 4–5.2. The defense team adhered to these standards in this case. (Tr. 1:60; 5:726).

11. In these proceedings, the defendant has submitted numerous affidavits from lay witnesses relating to conditions in Jonestown and Layton's mental state at the time of the events. The testimony of these lay witnesses would merely have been repetitive and cumulative of the testimony elicited on cross-examination of the government's witnesses, and their affidavits are therefore of little significance to the court.

12. The defendant has also submitted the affidavit of William M. Kunstler, an attorney who briefly represented Layton at a hearing in New York after Layton returned from Guyana. Kunstler's affidavit does not express any opinion whether the failure to present a psychiatric defense constituted ineffective assistance of counsel; nor does his affidavit indicate any knowledge of the reasons for not presenting such a defense. Kunstler does state that the failure to inform Layton of the mandatory life sentence constituted ineffective assistance of counsel, but he does not indicate the basis for his conclusion that the trial strategy would have been any different with knowledge of the mandatory life sentence. *See* Affidavit of William M. Kunstler at 3.

The defense team analyzed the insanity defense from every possible angle, discussed it with their client, and ultimately decided that it was better to rely on the strategy used at the first trial. In light of the many reasons against using a psychiatric defense, the court concludes that this decision was well within the bounds of reasonable professional conduct as measured by prevailing professional norms.

## CONCLUSIONS OF LAW

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court established the test to be applied for claims of ineffective assistance of counsel:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendants must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. at 2064.

■ In order to meet the first prong of the *Strickland* test, a defendant must demonstrate that his attorney's "representation fell below an objective standard of reasonableness" measured in relation to "prevailing professional norms." *Id.* at 688, 104 S.Ct. at 2065. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See id.* Reasoned tactical decisions do not constitute ineffective assistance of counsel, even if hindsight reveals that bet-

ter tactics were available. *See Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir.), *cert. denied*, 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984). In order to meet the second prong of the *Strickland* test, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. Finally, the *Strickland* opinion made clear that a court deciding an ineffective assistance claim is not required to address the two components of the test in any particular order, "or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697, 104 S.Ct. at 2069.

■ The court finds that Layton has failed to satisfy the second prong of the *Strickland* test with respect to his claim that he was not informed of the mandatory life sentence. For the reasons set forth in the findings of fact, the court finds that Layton would not have insisted on testifying or presenting a psychiatric defense if he had known of the mandatory life sentence, and that the defense team's strategy would not have been different. Thus, there is no "reasonable probability" that the attorneys' error would have changed the result of the proceeding, and the defendant has failed to demonstrate that his defense was prejudiced.

■ The court further finds that Layton has failed to satisfy the first prong of the *Strickland* test with respect to the claim that his attorneys failed to present a psychiatric defense. This decision was clearly a deliberate tactical choice made after extensive discussion among the attorneys and with the agreement of Layton himself. The defense lawyers vigorously argued their alternative theory that the government had failed to prove its case, a theory that had resulted in a hung jury during the first trial. Furthermore, the defense team had many reasonable grounds for deciding not to go forward with a psychiatric defense, as described in the findings of fact. Thus, the court concludes that Layton has not shown that his trial counsel's conduct

fell below an objective standard of reasonableness as measured by prevailing professional norms.[13]

## CONCLUSION

This court has twice presided over the trial of this case. At both trials, the court was impressed with the competence, conscientiousness, and dedication of the members of the defense team. The defense lawyers faced many difficult decisions in this case, only one of which was the decision whether to present a psychiatric defense. Layton could not have asked for better legal representation, and he has clearly been afforded effective assistance of counsel within the meaning of the Sixth Amendment of the United States Constitution.

IT IS SO ORDERED.

---

**13.** Indeed, the facts of this case are remarkably similar to the facts in *Fritchie v. McCarthy*, 664 F.2d 208, 214–15 (9th Cir.1981). In that case, a defendant convicted of first degree felony murder argued that he was denied the effective assistance of counsel because his attorney failed to present a diminished capacity defense. The Ninth Circuit noted that the trial counsel made a tactical choice by simply arguing that the defendant had not perpetrated the murder. The court further stated: "The diminished capacity defense, according to counsel's affidavit, would have undermined this strategy. Although the tactical choice may seem unwise in hindsight, it was not so unreasonable as to constitute denial of a constitutional right to effective assistance of counsel." *Id.* at 215. The same could be said of this case.