**Robert L. DERRICK, Petitioner–Appellant,**

v.

**R.S. PETERSON, Superintendent, Oregon State Correctional Institution, Respondent–Appellee.**

No. 89–35374.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 5, 1990.

Decided Aug. 28, 1990.

Amended Jan. 24, 1991.

Stephen R. Sady, Asst. Federal Public Defender, Portland, Or., for petitioner-appellant.

Michael C. Livingston, Asst. Atty. Gen., Salem, Or., for respondent-appellee.

Before WALLACE, SKOPIL and BRUNETTI, Circuit Judges.

WALLACE, Circuit Judge:

Oregon state prisoner Derrick appeals from the denial by the district court of his petition for habeas corpus. In his petition, Derrick contends that his convictions for murder and first-degree manslaughter are invalid because statements he made to the police, which were introduced at his trial, allegedly were made involuntarily under the fourteenth amendment's due process clause and without a knowing, intelligent, and voluntary waiver of his *Miranda* rights. The district court exercised jurisdiction pursuant to 28 U.S.C. §§ 2241 and 2254. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 2253. We affirm.

## I

Approximately 6:30 a.m. on December 26, 1981, Derrick, a 16 year old, came to the home of his aunt and uncle who lived across the street from the mobile home in which Derrick and his parents lived. Derrick told his uncle that Derrick's parents had been murdered during the night and that there was blood all over the mobile home. Derrick's uncle asked him where he had been the night before and Derrick responded that he had been in the mobile home but that he had not heard any shooting or struggling. Derrick's uncle then called a couple more of Derrick's relatives and together they went over to the mobile home. Upon seeing a pool of blood near where a pickup truck had been parked and drag marks across the lawn, they decided to forego any search of the mobile home and instead immediately contacted the sheriff.

Shortly after 8:00 a.m., Johannessen, a Tillamook County deputy sheriff, arrived to investigate the reported homicides. Johannessen spoke briefly with Derrick and several of his relatives. Derrick told Johannessen that he had arisen in the morning, had taken a shower, and that, upon coming out of the bathroom, he had seen the blood around the house. He had then come to his uncle's house to report that something had happened.

Johannessen then crossed the road to examine the scene. Upon entering the mobile home, he observed blood splatter marks, bone, tissue, and shotgun pellets in the area of Derrick's bedroom and the bedroom of his father and step-mother, which were joined by a hallway. After his initial inspection, Johannessen again spoke briefly with Derrick concerning how Derrick had originally found the scene. Derrick stated that when he had gone to bed the previous night, he had left his radio on at half volume and had not heard any gun blasts. He repeated that it was only after he finished his shower that he noticed the blood.

Shortly thereafter, two other deputies arrived and Johannessen learned that Derrick was a runaway from a juvenile group home. Approximately 9:20 a.m., Johannessen told Derrick that he was in custody because of his runaway status. He then handcuffed Derrick and placed him in the patrol vehicle. Johannessen also read Derrick his *Miranda* rights from a card and asked Derrick whether he understood that he did not have to talk to Johannessen. Derrick responded that he understood his rights and that he was willing to talk because he wanted Johannessen to "find out who did this thing." In response to Johannessen's questioning, Derrick reiterated his prior statement that he had not heard any shots fired because his radio had been on at half volume.

Johannessen then left Derrick in the patrol vehicle, where he remained until about 1:30 p.m., while Johannessen and other law enforcement officials conducted a more thorough investigation of the scene. Johannessen then transported Derrick to the Tillamook County sheriff's office, where Johannessen and Stephenson, a criminal investigator for the Oregon state police, interviewed Derrick from about 2:00 p.m. until about 5:00 p.m. Prior to this interrogation, Derrick's handcuffs were removed and Stephenson readvised Derrick of his *Miranda* rights. Stephenson used an Oregon state police "Advice of Rights" form which contains a seven-item checklist. Stephenson read through each item on the form, inquired whether Derrick understood that particular item, and received an af-

firmative response from Derrick each time. Derrick then signed a written waiver of those rights and then talked with the officers.

Stephenson and Johannessen questioned Derrick about some inconsistencies in his story. Among other things, they asked him why he had stated that he heard dogs barking and his parents truck leave when he had not heard a shotgun blast right outside his bedroom door. Finally, soon after hearing a radio dispatch announcing that his parent's bodies had been found, Derrick admitted that he had heard the shots. He further stated that upon hearing the shots he had barricaded himself in his bedroom. For the remainder of this interview, the officers questioned Derrick about inconsistent or unbelievable elements of his story. About 5:00 p.m., Derrick was taken to juvenile detention.

Approximately 9:50 p.m. Derrick was returned to the sheriff's office for further questioning. Prior to this additional questioning, Stephenson again explained to Derrick his *Miranda* rights. Stephenson testified that Derrick stated "that he understood his rights, that he had been advised of them numerous times, ... and was quite well aware of what that procedure was and his right to counsel." Stephenson and Johannessen then confronted Derrick with more inconsistencies in his story. Sometime prior to 11:30 p.m., Stephenson showed Derrick a picture of his father and stepmother's bodies and asked if Derrick could identify them. Upon viewing the pictures, Derrick became tearful. After a few moments of silence, Derrick admitted shooting both his father and his stepmother with a shotgun at close range. He also described his efforts at cleaning up the scene and concealing the evidence. Derrick was again advised of and waived his *Miranda* rights, and then repeated his confession which was recorded. This last interview concluded about 11:50 p.m. Derrick was then placed under arrest for these crimes, taken to the hospital for a blood test, and booked in Tillamook County jail about 12:30 a.m. on December 27.

At the hearing on Derrick's motion to suppress his confession, Johannessen and Stephenson both testified that Derrick was calm, alert, responsive, and cooperative at all times. Stephenson stated that Derrick showed emotion only twice during their conversations—once when he heard the radio dispatch that his parents' bodies had been found and a second time when he was shown the pictures of his parents. In both instances, Derrick regained his composure after a minute or two and proceeded with his story.

Judge Mayer, a Tillamook County judge before whom Derrick had previously appeared on a number of juvenile matters, testified that he had fully explained the *Miranda* rights to Derrick one year before the homicides and that Derrick's responses indicated that he understood those rights.

Two clinical psychologists, Dr. Lazere and Dr. DeCourcy, also testified at the hearing. Dr. Lazere had evaluated Derrick in March of 1981 in connection with a juvenile case and again in January 1982 after Derrick's arrest for his parents' murder. He testified that on the Slaussen intelligence test which he had administered in March 1981, Derrick achieved a mental age of nine years, ten months, which yielded an I.Q. of 62, placing him in the mildly delayed range of intellectual ability. When he was questioned regarding Derrick's ability to understand his *Miranda* rights, Dr. Lazere opined:

> I think he would be able to understand the words themselves. I think he would be able to understand the concepts that the combined weight of the words was meant to convey, but whether he could understand the import of testifying, of talking about what had happened, and its relationship to his well-being in the future, of that I have serious doubts.

On cross-examination, however, Dr. Lazere stated that he was unaware of Derrick's previous arrests or that Derrick had received a careful explanation of his *Miranda* rights from Judge Mayer. He stated that these prior encounters with the *Miranda* warnings would make a "sub-

stantial difference" in Derrick's ability to understand and assert his *Miranda* rights.

Dr. DeCourcy's testimony was similar to Dr. Lazere's. He stated that Derrick's score on a different I.Q. scale—the Wexler Adult Intelligence Scale—was 74, placing him in the borderline range of mental retardation falling between dull-normal and the mild retardation range. He also related that when he had interviewed Derrick, Derrick had stated that because he had been arrested so many times, he understood what his rights were but felt that the police would assume his guilt if he refused to talk. Dr. DeCourcy opined that based upon his interview of Derrick he believed that Derrick could indeed understand his rights—i.e. that he could understand that he could ask to have an attorney present and did not have to answer questions—but that he could not adequately foresee the consequences of his actions and "utilize the protection afforded by the *Miranda* warnings to protect his own best interests."

After hearing this and other evidence, the state trial judge denied Derrick's motion to suppress his confession. In doing so, he made the following findings:

> There is absolutely no evidence in the record that defendant at any time was induced, coerced, threatened, or promised anything by the officers who spoke with him. He was scrupulously advised and readvised of his constitutional rights per *Miranda*, and at all times indicated a willingness to talk with the investigating officers.
>
> The defendant knew what his *Miranda* rights were and in fact had on previous occasions exercised those rights in a juvenile proceeding before Judge Mayer.
>
> There is no evidence in the record that defendant was under the influence of any form of intoxicant (alcohol or controlled substances) and the Court finds he was not.
>
> There is no evidence in the record that there was any form of police misconduct in talking with the defendant.
>
> It is true that the defendant is not a person of high intelligence; however, taking all of the evidence into considera-

tion the court is satisfied that defendant, (1) was more than adequately advised of his *Miranda* rights; (2) understood the concept of those rights and how to exercise them; (3) was not subject to any form of police misconduct at any time; (4) acted freely and voluntarily in talking with the officers investigating the crime.

Following a jury trial, Derrick was convicted of first degree manslaughter and murder. After exhausting his state relief, Derrick sought habeas corpus relief in federal district court, alleging that his confession was involuntary under the fourteenth amendment's due process clause and that his *Miranda* waiver was invalid because it was not knowing, voluntary and intelligent. The district court denied his petition for relief which we review de novo. *Grooms v. Keeney*, 826 F.2d 883, 885 (9th Cir.1987) (*Grooms*).

## II

■ We first address whether Derrick's confession was voluntary within the meaning of the fourteenth amendment's due process clause. Our review of the "ultimate issue of 'voluntariness'" is de novo. *Miller v. Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985) (*Miller*) ("[T]he ultimate issue of 'voluntariness' is a legal question requiring independent federal determination."). The state court's subsidiary factual determinations underlying the issue of voluntariness are entitled to a presumption of correctness. 28 U.S.C. § 2254(d); *Miller*, 474 U.S. at 112, 117, 106 S.Ct. at 450–51, 453.

■ In evaluating the voluntariness of a confession, we inspect "whether, under the totality of circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *Id.* at 112, 106 S.Ct. at 450–51. "The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir.1988), *citing Haynes v. Washington*,

373 U.S. 503, 513–14, 83 S.Ct. 1336, 1342–44, 10 L.Ed.2d 513 (1963). This totality of the circumstances test was clarified and refined by the Supreme Court in *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (*Connelly* ). There, the Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Id.* at 167, 107 S.Ct. at 522. The Court emphasized that in the confession cases it had decided over the previous 50 years, the "crucial element" had been the presence of "police over-reaching." *Id.* at 163 & n. 1, 107 S.Ct. at 520 & n. 1. Thus, the Court has made it clear that a confession is only involuntary under the fourteenth amendment if the police use coercive activity to undermine the suspect's ability to exercise his free will. As the Eighth Circuit stated, *"Connelly* makes it clear that . . . personal character-istics of the defendant are constitutionally irrelevant absent proof of coercion." *United States v. Rohrbach,* 813 F.2d 142, 144 (8th Cir.) (internal quotations omitted), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 381 (1987). Consequently, Der-rick's age and mental capacity are relevant to our due process inquiry only if we first conclude that the police's conduct was coer-cive.

### A.

The state trial judge found that "[t]here is no evidence in the record that there was any form of police misconduct in talking with the defendant." The state maintains that our review is limited because this statement amounts to a subsidiary factual finding and is thus entitled to a presump-tion of correctness pursuant to section 2254(d).

However, the presence of "coercive po-lice activity," *Connelly,* 479 U.S. at 167, 107 S.Ct. at 522, has generally been con-sidered by us as an issue for de novo review. Soon after *Connelly* was decided, we stated:

We review *de novo* the court's conclusion that the confession was voluntary be-cause *Connelly*'s focus on the constitu-tional acceptability of the government conduct rather than merely on the defen-dant's state of mind at the time of the confession "requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles."

*United States v. Wolf,* 813 F.2d 970, 974 (9th Cir.1987) (*Wolf* ), *quoting United States v. McConney,* 728 F.2d 1195, 1202 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984); *see also United States v. Crespo De Llano,* 838 F.2d 1006, 1015 n. 2 (9th Cir.1987) ("The district court's determination of the constitutional acceptability of the govern-ment's conduct is reviewed *de novo.*"); *United States v. Eccles,* 850 F.2d 1357, 1361 (9th Cir.1988) ("[T]he district court's conclusion as to voluntariness of a confes-sion is reviewed *de novo.*"). Because *Wolf, Crespo De Llano,* and *Eccles* all involved appeals on direct review, we must decide whether the same standard of review should be applied in state habeas corpus review.

In both direct and collateral review, the question whether the trial court's deter-mination is factual or legal is the same. It would therefore be incongruous to apply a different standard of review for the same issue when we are assessing the same con-stitutional right. Rather, if the issue in both cases is one of law, we would natural-ly review both issues de novo. Conse-quently, we are unpersuaded that the state trial court's finding that the police did not coerce Derrick is entitled to a presumption of correctness. Instead, we conclude that, based upon our precedents in the direct review context, we are obligated to conduct an independent review of the "constitution-al acceptability" of the police's interroga-tion of Derrick.

### B.

Derrick points to several aspects of his interrogation which he claims amounted to coercive police activity. We address them in turn.

Derrick's initial argument is that the length of his detention, including the four hours he sat alone in the police car, and the duration of the questioning to which he was subjected were coercive and thus rendered his confession involuntary. It is important to observe, however, that Derrick does not argue that the length of the detention was impermissible under *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975) (holding that the fourth amendment requires the police to take a criminal suspect before a neutral magistrate after "a brief period of detention to take the administrative steps incident to arrest"), and indeed he could not. Derrick was an escapee from the juvenile group home and was taken into custody on that basis. The police plainly did not overreach by holding Derrick in post-trial custody throughout the day. *Cf. Smith v. Saxbe*, 562 F.2d 729, 735 (D.C.Cir.1977) (holding *Gerstein* inapplicable to post-trial custody); *United States v. Woods*, 613 F.2d 629, 632–34 (6th Cir.) (concluding that delay in bringing defendant before magistrate during federal interrogation was not impermissible where defendant was in state custody), *cert. denied*, 446 U.S. 920, 100 S.Ct. 1856, 64 L.Ed.2d 275 (1980). We, therefore, reject Derrick's argument that the police somehow overreached and improperly coerced him because of the duration of his detention.

■ Derrick next contends that the police engaged in "deceitful" behavior by informing him that he was in custody for running away from the juvenile group home and then questioning him about the murders. This contention is completely lacking in merit. There is no question that Derrick was properly taken into custody for leaving the juvenile group home. Moreover, the record indicates that Derrick was well-informed that the purpose of his questioning was to elicit information from him regarding his missing parents and their apparently violent murders. Questioning Derrick about a second crime while he was properly in custody for a first crime did not amount to police misconduct.

■ Derrick also argues that his confession was involuntary because the police failed to contact any of his relatives so that they could be present during the interrogation. Derrick, however, did not request to speak with his relatives. Derrick directs us to no case, and we have found none, requiring that a juvenile's relative be present prior to any confession. We conclude that the police's "failure" to contact Derrick's relatives was not a form of coercive misconduct.

■ Derrick also contends that the police coerced his confession by showing him the photographs of his deceased father and stepmother and requesting him to confirm their identity. While we agree that showing Derrick the photographs may have been insensitive, we fail to see how such insensitivity constitutes coercion prohibited by the due process clause. Derrick, however, contends that the photographs were obviously coercive because his complete confession followed soon thereafter. This argument misses the mark. The voluntariness inquiry has never been one of but-for causation whereby a confession is rendered inadmissible simply because it was precipitated by police conduct. *Hutto v. Ross*, 429 U.S. 28, 30, 97 S.Ct. 202, 203–04, 50 L.Ed.2d 194 (1976) (per curiam). Instead, the voluntariness inquiry focuses on whether the police's conduct was constitutionally acceptable. We conclude that it was.

■ Finally, we reject Derrick's claims of improper police conduct because, as his counsel stated at oral argument, Derrick's age and mental capacity are "the critical part" of his coercion claim. In other words, this part of Derrick's argument assumes that the police behavior in question here was acceptable absent Derrick's own unique circumstances. Such a claim is precisely the type that *Connelly* was intended to foreclose. We, therefore, conclude that Derrick's confession was voluntary under the due process clause of the fourteenth amendment.

820

## III

■ Derrick next contends that his waiver of his *Miranda* rights was invalid because it was not voluntary, knowing and intelligent. The Supreme Court in *Connelly* held that "[t]here is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context." 479 U.S. at 169–70, 107 S.Ct. at 523. Thus, because we have already concluded that Derrick's confession was voluntary under the fourteenth amendment, we hold that his waiver of his *Miranda* rights was voluntary.

While *Connelly* clearly holds that the "voluntariness" inquiry in the *Miranda* waiver context is equivalent to the voluntariness inquiry under the fourteenth amendment, it is not as clear whether an inspection of the "knowing" and "intelligent" prong of the *Miranda* waiver analysis is likewise rendered unnecessary by a conclusion that a confession is voluntary under the fourteenth amendment. That is the burden of our next inquiry.

In *Connelly*, the Court did not reverse outright the state court's decision that the defendant's *Miranda* waiver was invalid. 479 U.S. at 171, 107 S.Ct. at 524. Instead, the Court remanded, stating:

It is possible to read the opinion of the Supreme Court of Colorado as finding respondent's *Miranda* waiver invalid on *other grounds.* Even if that is the case, however, we nonetheless reverse the judgment in its entirety because of our belief that the Supreme Court of Colorado's analysis was influenced by its mistaken view of "voluntariness" in the constitutional sense. Reconsideration of other issues, not inconsistent with our opinion, is of course open to the Supreme Court of Colorado on remand.

*Id.* at 171 n. 4, 107 S.Ct. at 524 n. 4 (emphasis added). Thus, *Connelly* left open the issue of whether the state court could find the defendant's *Miranda* waiver invalid on grounds other than "voluntariness"—i.e. on the grounds that the waiver was not "knowing" or "intelligent." *See id.* at 187–88, 107 S.Ct. at 532–33 (Brennan, J., dis-

senting) (stating that the state court is not precluded on remand from finding the waiver invalid on these other grounds).

■ Whatever doubt remained after *Connelly* concerning the distinct nature of the knowing and intelligent prong of the waiver inquiry was removed by the Court's decision in *Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) (*Spring*), later that same term. In *Spring*, the Court emphasized:

[t]he inquiry whether a waiver is coerced "has *two distinct dimensions.*" *Moran v. Burbine*, 475 U.S. 412, 421 [106 S.Ct. 1135, 1141, 89 L.Ed.2d 410] (1986):

"First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal *both* an uncoerced choice *and* the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Ibid.*, (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 [99 S.Ct. 2560, 2572, 61 L.Ed.2d 197] (1979)).

*Id.* 479 U.S. at 573, 107 S.Ct. at 856–57 (emphasis added). Thus, in light of *Spring*, it is clear that, although a determination of voluntariness under the fourteenth amendment forecloses a similar inquiry in the *Miranda* waiver context, we must conduct a separate review of whether Derrick knowingly and intelligently waived his *Miranda* rights.

As a matter of logic this result is somewhat unsatisfactory. On the one hand, *Connelly* emphasizes that "mere examination of the confessant's state of mind can never conclude the due process inquiry." 479 U.S. at 165, 107 S.Ct. at 521. Yet, in the *Miranda* context, the Court allows a waiver to be invalidated based only upon the confessant's state of mind—i.e. based only upon whether the waiver is knowing

and intelligent. *See Spring,* 479 U.S. at 573, 107 S.Ct. at 856–57. Thus, the Court requires that there be improper state action under the fourteenth amendment before a confession can be suppressed, but requires no such state action in the *Miranda* context, even though the constitutional provision underlying the *Miranda* warning—the fifth amendment—is applied to the states through that same fourteenth amendment. *See Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1493–94, 12 L.Ed.2d 653 (1964) (incorporating fifth amendment's self-incrimination clause). Nevertheless, until the Supreme Court decides to address this apparent tension, we conclude that we are obligated to bifurcate the *Miranda* waiver analysis into an inspection of (1) whether the waiver was "voluntary" and (2) whether the waiver was "knowing" and "intelligent." Having previously answered the first inquiry, we now turn our attention to the second.

Initially, we must resolve whether the Oregon state court's finding that Derrick understood his *Miranda* rights (the knowing and intelligent prong) is entitled to a presumption of correctness pursuant to section 2254(d). Prior to the Supreme Court's decision in *Miller,* this circuit, in its direct review cases, reviewed the question "whether a defendant in fact knowingly and voluntarily waived his *Miranda* rights ... under the clearly erroneous standard." *United States v. Doe,* 819 F.2d 206, 209 (9th Cir.1987); *see also United States v. Binder,* 769 F.2d 595, 598 (9th Cir.1985); *United States v. Hooton,* 662 F.2d 628, 631 (9th Cir.1981), *cert. denied,* 455 U.S. 1004, 102 S.Ct. 1640, 71 L.Ed.2d 873 (1982). We treated the validity of the waiver question as factual because the focus of the inquiry was "on the defendant's subjective state of mind at the time of the waiver." *Wolf,* 813 F.2d at 975 n. 16. In our pre-*Miller* collateral review cases, we likewise accorded a presumption of correctness to state court determinations that a defendant's mental state did not affect the validity of his waiver. *See Nelson v. McCarthy,* 637 F.2d 1291, 1295 (9th Cir.1980) (*Nelson* ) (presuming correct the state trial court's determination that the defendant's intoxication did

not affect his waiver), *cert. denied,* 451 U.S. 940, 101 S.Ct. 2021, 68 L.Ed.2d 327 (1981); *cf. Fritchie v. McCarthy,* 664 F.2d 208, 212–14 (9th Cir.1981) (*Fritchie* ) (presuming correct the state trial court's determination that defendant's confession was voluntary under the fourteenth amendment despite that defendant's long history of mental illness).

This clear precedent was clouded somewhat by *Miller.* There, the Court held, in the fourteenth amendment context, that the voluntariness of a confession was to be reviewed de novo, and that only subsidiary facts were to be accorded a presumption of correctness under section 2254(d). 474 U.S. at 112, 106 S.Ct. at 450–51. In attempting to define a "subsidiary question of fact," the Court stated: "[a] few principles [for distinguishing questions of fact from questions of law] are by now well-established. For example, that an issue involves an inquiry into the state of mind is not at all inconsistent with treating it as a question of fact." *Id.* at 113, 106 S.Ct. at 451. Thus, *Miller* suggested that in the fourteenth amendment context, while the "ultimate" issue of voluntariness was to be reviewed de novo, a state trial court's determinations regarding a defendant's state of mind were factual and thus were to be given a presumption of correctness. The question after *Miller,* therefore, was how its teachings applied in the *Miranda* waiver context.

Some additional light was cast upon this issue by the Court's subsequent separation of the voluntariness prong from the knowing and intelligent prong of the waiver inquiry in *Connelly* and *Spring.* That bifurcation left open the possibility of a different scope of review of a state court's determination with regard to the knowing and intelligent prong of the waiver inquiry as distinguished from the voluntariness prong. We have yet to address whether the Court has overturned our clear precedent requiring review of the knowing and intelligent prong for clear error.

In two post-*Miller* and post-*Connelly* cases—*Grooms* and *Terrovona v. Kincheloe,* 852 F.2d 424 (9th Cir.1988) (*Terrovo-*

*na*)—we did address the proper scope of the inquiry into a defendant's waiver of his *Miranda* rights. A close reading of those two cases, however, indicates that they addressed only the voluntariness prong of the waiver inquiry. Neither held that our prior knowing and intelligent prong standard of review had been overturned by the Supreme Court.

In *Grooms,* we held that "[a] federal court must conduct an independent review of the voluntariness of a confession." 826 F.2d at 887. We then stated: "In this case the magistrate reviewed the trial transcript and transcription of the tape of the interrogation and concluded Grooms made a voluntary, intelligent and knowing waiver of his rights. We agree." *Id.* Because the terse statement "We agree" constitutes the extent of our analysis, it is impossible to discern whether the magistrate afforded a presumption of correctness to the "knowing" and "intelligent" components of his waiver inquiry. Thus, *Grooms* can only be read to stand for the one undisputed legal proposition it actually states: a federal court must conduct an independent review of the voluntariness of a confession.

This reading of *Grooms* finds support in our subsequent decision in *Terrovona.* See *Terrovona,* 852 F.2d at 427. There, we questioned whether *Grooms* was persuasive authority for the proposition that a federal court must conduct an independent review of the validity of a waiver, *id.* at 427 n. 2, and proceeded to reevaluate the waiver issue. *Id.* at 427–28. But, our reevaluation focused solely on the standard of review of the "voluntariness" of a waiver. We stated that we were "reaffirm[ing] *Grooms'* adoption of a plenary standard of review because we find that the *voluntariness* of a waiver is a mixed question of law and fact that requires *de novo* review." *Id.* (emphasis added).

In reaching this conclusion, we specifically agreed with the Third Circuit's holding in *Ahmad v. Redman,* 782 F.2d 409, 413 (3d Cir.) (*Ahmad*), *cert. denied,* 479 U.S. 831, 107 S.Ct. 119, 93 L.Ed.2d 66 (1986), that voluntariness of a waiver is reviewed de novo. We find it of interest that in *Ahmad,* the Third Circuit explicitly differentiated between the issue of whether the defendant understood his *Miranda* warnings and the issue whether the waiver of those rights was voluntary. *Id.* at 412–13. *Ahmad* held that "the state court findings that [the defendant] received and understood his *Miranda* warnings must be presumed correct if fairly supported by the record" but that "the voluntariness of a waiver of *Miranda* rights is . . . subject to plenary review by federal habeas courts." *Id.* Thus, *Terrovona's* agreement with the Third Circuit's opinion in *Ahmad* suggests that *Terrovona* decided only that the presumption of correctness does not apply to the voluntariness inquiry and plainly did not hold that the knowing and intelligent component of the *Miranda* waiver analysis was likewise subject to plenary federal review. We, therefore, conclude that *Terrovona,* like *Grooms,* addresses only the proper scope of the voluntariness inquiry.

Although we did consider the knowing and intelligent component in *Shedelbower v. Estelle,* 885 F.2d 570 (9th Cir.1989) (*Shedelbower*), we did not clearly state the standard of review applicable to it. We quoted the following language from *Miller,* 474 U.S. at 112, 106 S.Ct. at 450–51: "the ultimate question of whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatable [sic] with the requirements of the Constitution is a matter for independent federal determination." *Shedelbower,* 885 F.2d at 572. Standing alone, this statement might be read as a sweeping approval of plenary review. *Miller,* however, considered only the voluntariness component of the waiver inquiry, so our quotation of its language can only be properly read as relating to that single component. *See Miller,* 474 U.S. at 105–06, 106 S.Ct. at 447. Moreover, we also stated in *Shedelbower* that "[f]indings of historical fact by state courts are presumed to be correct under 28 U.S.C. § 2254(d)." *Shedelbower,* 885 F.2d at 572. Given the innate limitations of the *Miller* language, this second statement might be read as encompassing all issues other than voluntariness, including the knowing and intelligent component. The

holding in *Shedelbower* was made without reference to either the plenary or deferential standard. *See id.* at 575 ("we conclude that Shedelbower validly waived his Fifth and Fourteenth Amendments right to counsel"). Thus, we find the opinion ultimately ambiguous.

Unlike in *Grooms, Terrovona,* and *Shedelbower,* we did squarely address the issue of whether the knowing and intelligent component of the waiver inquiry is entitled to a presumption of correctness in *Wolf,* a case on direct review. There, we discussed three possible interpretations of *Connelly* in an effort to understand whether *Connelly* had undermined our prior precedent mandating a clearly erroneous standard of review. *Wolf,* 813 F.2d at 975–76 n. 16. We concluded that it was not necessary to determine precisely which of these three interpretations was correct because the defendant

> would have no colorable claim that his right against self-incrimination was violated whichever version of the waiver issue is correct. Under *de novo* review, we reject the claim that the police used objectively unacceptable methods to coerce Wolf into waiving his right to silence for the same reasons that we reject his due process claim. And under the clearly erroneous test, we uphold the district court's conclusion that there is "no evidence" to support Wolf's claim that his waiver was involuntary in the sense that his subjective will was overborne.

*Id.* The teaching of *Wolf,* therefore, was that whatever the interpretation of *Connelly,* we review the question of police coercion de novo and we review the question of whether the defendant's mind was overborne—i.e., was his waiver knowing and intelligent—for clear error.

■ The only question remaining is whether we should apply *Wolf's* reasoning to the collateral review context and accord a section 2254(d) presumption of correctness to a state trial court's determination that a defendant knowingly and intelligently waived his *Miranda* rights. Other circuits have applied this presumption of correctness in collateral review cases. *Perri v. Director of the Department of Corrections of Illinois,* 817 F.2d 448, 451 (7th Cir.) (observing that the inquiry into whether a defendant's waiver was knowing and intelligent "will often require an assessment of the credibility of the defendant and the government's witnesses" and concluding that "[t]he resolution of conflicting stories is appropriately made by the court of initial impression and not a federal court on collateral review"), *cert. denied,* 484 U.S. 843, 108 S.Ct. 135, 98 L.Ed.2d 92 (1987); *see also Ahmad,* 782 F.2d at 412–13. Moreover, it would be entirely anomalous to refuse to extend *Wolf* to the collateral review context and thereby afford greater deference to the factual findings of a district court than to the factual determinations of a state trial court. Such a rule would be contrary not only to the purpose behind section 2254, but also to sound principles of federalism. Finally, attributing a presumption of correctness to a state trial court's finding that a waiver was knowing and intelligent adheres to *Miller's* statement that "an issue involv[ing] an inquiry into state of mind" is properly treated as an issue of fact, 474 U.S. at 113, 106 S.Ct. at 451, and comports with our own pre-*Miller* and pre-*Connelly* collateral review cases which clearly accorded a section 2254(d) presumption of correctness to state trial court determinations of a defendant's state of mind. *See Nelson,* 637 F.2d at 1295; *cf. Fritchie,* 664 F.2d at 212–14. We, therefore, hold that a state trial court's determination that a defendant knowingly and intelligently waived his *Miranda* rights is entitled to a presumption of correctness pursuant to section 2254(d).

As we stated above, the Oregon trial court found that Derrick "was more than adequately advised of his *Miranda* rights [and] understood the concept of those rights and how to exercise them." Since we have concluded that this finding is entitled to a presumption of correctness, we are obligated to treat this factual finding as accurate "unless one of the circumstances listed in section 2254(d)(1) to (7) exists, unless the [state court] determination is not fairly supported by the state

court record, or unless [Derrick] shows by convincing evidence that the factual determination by the state court is erroneous." *Tinsley v. Borg*, 895 F.2d 520, 525 (9th Cir.1990). Derrick does not argue that any of section 2254(d)'s exceptions apply here. Therefore, we turn to whether the state court's finding is fairly supported by the record.

■■■ Derrick was read or informed of his *Miranda* rights at least four times, and each time he waived those rights either orally or in writing. The written waiver in particular is strong evidence that the waiver was valid. *United States v. Bernard S.*, 795 F.2d 749, 753 n. 4 (9th Cir.1986) (concluding that although not dispositive, a juvenile's written waiver is "strong" evidence that the waiver is valid); *Norman v. Ducharme*, 871 F.2d 1483, 1488 (9th Cir. 1989). Moreover, Derrick's prior arrests and Judge Mayer's previous explanations of the *Miranda* warnings also suggest that Derrick understood his *Miranda* rights. *See Fare v. Michael C.*, 442 U.S. 707, 726, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979) (concluding that 16½-year-old juvenile's prior experience with the police suggests he understood the nature of his *Miranda* waiver); *United States v. Pinion*, 800 F.2d 976, 981 (9th Cir.1986), *cert. denied*, 480 U.S. 936, 107 S.Ct. 1580, 94 L.Ed.2d 770 (1987); *United States v. Heredia–Fernandez*, 756 F.2d 1412, 1416 (9th Cir.), *cert. denied*, 474 U.S. 836, 106 S.Ct. 110, 88 L.Ed.2d 90 (1985). Finally, Derrick's own psychologists testified that he could understand the concepts that the *Miranda* warnings are meant to convey. Although they also believed that Derrick could not adequately understand the possible consequences that would flow from waiving those rights and talking to the police, such a lack of foresight has never prevented an individual from waiving his *Miranda* rights. *Oregon v. Elstad*, 470 U.S. 298, 316, 105 S.Ct. 1285, 1296–97, 84 L.Ed.2d 222 (1985) ("This Court has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness."); *Spring*, 479 U.S. at 574, 107 S.Ct. at 857; *Moran v.*

*Burbine*, 475 U.S. 412, 422, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).

Finally, we hold that Derrick has failed to meet his burden of showing by "convincing evidence" that the trial judge, after hearing the testimony of Judge Mayer and other witnesses, erroneously found that Derrick was capable of understanding the *Miranda* warnings.

We affirm the state court finding that Derrick knowingly and intelligently waived his *Miranda* rights.

AFFIRMED.