30 F.3d 140
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Beatrice BENTLEY, aka: Akiko Tsukida; aka: Beatrice Dell
Bently; aka: Beatrice Bell Bentley; aka:
Beatrice D. Beatty: aka: Beatrice D.
Bentley, Defendant-Appellant.
 No. 93-50457.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 5, 1994.
Decided Aug. 4, 1994.
 
 1
 Before: BROWNING and FLETCHER, Circuit Judges, and FITZGERALD,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 After a jury trial, appellant Beatrice Bentley was convicted on both counts of a two-count drug trafficking indictment. She appeals (1) the district court's denial of her motion to suppress statements she made to DEA agents after her arrest, and (2) the court's admission of "other acts" evidence. We affirm, although on different grounds than those relied on by the district court.
 
 BACKGROUND
 1. Evidence at Trial
 
 4
 On August 17, 1992, Bentley, in a taped conversation, agreed to sell to a confidential informant (CI) one ounce of crack cocaine for $750. Later that day, the CI met Bentley at her apartment, and Bentley drove the CI to another house which she entered and he did not. Bentley emerged and met with the CI again; after this meeting, when the CI returned to the DEA agents who were monitoring him, he had only $375 of the $750 they had given him, and half an ounce of crack cocaine which he had not had before.
 
 
 5
 On August 20, 1992, the CI, again closely monitored by DEA agents, went to Bentley's residence with $1500 in government funds, and came out without the money but with two ounces of crack cocaine.
 
 
 6
 On September 1, 1992, the CI and Bentley agreed to a third sale: Bentley would supply the CI with eight ounces of cocaine in return for $5600. During this conversation, the CI mentioned that he had China White, a form of heroin, and that he would bring it to Bentley's apartment.
 
 
 7
 2. Bentley's Admissions and the Motion to Suppress
 
 
 8
 On September 2, 1992, DEA agents went to Bentley's apartment, equipped with a search warrant and an arrest warrant. DEA agents and Los Angeles Police Department officers arrested Bentley outside the building. She was handcuffed and brought inside, to her bedroom. She was met there by two DEA special agents, Cam Strahm and Jeanette Ferro.
 
 
 9
 Strahm read Bentley her Miranda rights from a form. He asked her if she understood what he had said, and she answered that she had.
 
 
 10
 Strahm testified that he also asked Bentley if she was willing to answer questions; this query was printed on the Miranda form. According to Strahm, Bentley said that she would answer his questions, and that she had nothing to hide. According to Ferro, Strahm asked Bentley both whether she understood her rights and whether she would like to answer questions; Bentley answered yes to both inquiries. Bentley, however, testified that she was never asked if she wanted to answer questions. But she does not appear to dispute that she said at some point that she was willing to talk.
 
 
 11
 Bentley insists that the reading of her rights was conducted in an atmosphere of commotion: while her rights were being read, one officer was screaming in her ear "where are the guns"; Agent Ferro was screaming that she was under arrest,[1] and was showing her the arrest and search warrants; and the two children in Bentley's apartment were screaming. According to Bentley, "[i]t was just out of control." RT 1/11/93 at 34.
 
 
 12
 After Bentley had been read her rights, she and the agents engaged in approximately ten minutes of "discussion." Bentley stated that the agents did not ask her questions, but rather made statements. One of those statements, made by Ferro, was that if Bentley would disclose the source of her drugs, the DEA would tell the prosecutor that she had cooperated.[2] According to Strahm, the ten-minute discussion also included "a disclosure with Ms. Bentley as to her guilt or innocence." RT 1/11/93 at 10.
 
 
 13
 At the end of the discussion, Bentley told the agents that she knew why they were there. She then said that she had planned to run a "twist" on the CI. Ferro asked her what a "twist" was, and Bentley explained that she intended to sell fake drugs to the CI, because he had never sampled the quality of the drugs she had sold him in the past. This latter statement was extremely damaging, since in making it Bentley admitted that she had sold drugs to the CI in the past--which was precisely the crime for which she was arrested.
 
 
 14
 Bentley brought a motion to suppress all statements she made to the DEA, arguing that she had never waived her Miranda rights. The government opposed the motion, contending that she had waived her rights. The district court held an evidentiary hearing, and heard testimony from Strahm, Ferro, and Bentley. The court then denied the motion to suppress, finding that there had been no interrogation by the officers, and that "any statements made by [Bentley] were not as a result of the questioning by the officers, but yet she explained her position and went on to say other things." RT 1/11/93 at 47.
 
 As to waiver, the court stated as follows:
 
 15
 I'll make some findings as to that.... The record--I don't think shows that the witness--that the Defendant said she understood her rights. What the record shows is that that question was asked. There appears to be no answer to that question. "Are you willing to answer questions?" No specific answer to that question either, apparently, but at some point she stated that she would answer questions.
 
 
 16
 The Court's finding here would be she was not specifically--she did not specifically say she understood. She did say she would answer questions. One of the officers testified that she said she didn't have anything to hide, so she would talk to the officers. So, the Court would find that her mental state was one of being willing to talk, but I don't find that there was any interrogation by the officers here, and so, therefore, there's no violation of Miranda and the Court would deny the motion to suppress.
 
 
 17
 Id. at 48.
 
 3. Use of Other Acts Evidence
 
 18
 Before trial, the government filed a motion in limine seeking to introduce evidence of Bentley's September 1, 1992 conversation with the CI.[3] In that conversation, which was taped, Bentley agreed to sell eight ounces of crack for $5600. The district court reserved ruling on the government's motion, explaining that the relevance of the other acts evidence would depend on the defense, and possibly on the substance of the defendant's cross-examination of the confidential informant.
 
 
 19
 Defendant's theory at trial was that she never sold drugs to the informant, but only led him on in the hope of getting him to supply her with China White. Defendant contended that the informant preyed upon her addiction to that drug. Accordingly, defense counsel asked the CI, in cross-examination, whether he had ever mentioned China White to Bentley. The CI had in fact done so during the September 1 conversation.
 
 
 20
 The CI, however, denied that he had ever discussed China White with Bentley. Later, court and counsel discussed at length how to proceed. The prosecutor explained that the CI had lied only because he thought he was forbidden to discuss any drug transactions other than the two with which Bentley had been charged. The court then explained that if defendant impeached the CI by referring to those portions of the September 1 conversation in which the CI discussed China White, then the government, in order to rehabilitate the CI, would want to introduce other portions of the conversation, and to point out that the conversation as a whole had concerned another drug deal. Bentley's attorney said that the defense had no objection to this, although counsel also made it clear that defendant would object if the entire tape of the September 1 conversation were played.
 
 DISCUSSION
 
 21
 A. Admission of Bentley's Statements to DEA Agents
 
 
 22
 We review for clear error the district court's determination as to whether a suspect was interrogated. United States v. LaPierre, 998 F.2d 1460, 1466 (9th Cir.1993); United States v. Poole, 806 F.2d 853 (9th Cir.), amending 794 F.2d 462 (9th Cir.1986).
 
 
 23
 Determining whether a waiver of Miranda rights is valid involves a two-part inquiry. We review de novo a determination that the waiver was voluntary, and review for clear error a determination that the waiver was knowing and intelligent. United States v. Bautista-Avila, 6 F.3d 1360, 1364 (9th Cir.1993); Derrick v. Peterson, 924 F.2d 813, 817, 823 (9th Cir.1990), cert. denied, 112 S.Ct. 161 (1991).
 
 1. Interrogation
 
 24
 In Rhode Island v. Innis, 446 U.S. 291 (1980), the Supreme Court held that a suspect's Miranda rights are triggered by "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301. The Court emphasized that Miranda is not limited to "express questioning," or to statements "punctuated with a question mark." Id. at 301 & n. 6. The Court noted that Miranda itself had been deeply concerned with a whole array of police techniques, deceptive or otherwise, used to elicit incriminating responses: the staged lineup; the reverse lineup; the good cop/bad cop routine; the dogged assertion of the victim's guilt; the minimization of the seriousness of the offense; the pseudo-shifting of guilt onto the victim or onto society. Innis, 446 U.S. at 299; Miranda v. Arizona, 384 U.S. 436, 448-55 (1966). Since these techniques of persuasion are the "functional equivalent" of express questioning, they too are forbidden unless a suspect has been informed of, and has waived, her Miranda rights. 446 U.S. at 299-301.
 
 
 25
 The Innis Court also declined to confine the meaning of "interrogation" to conduct which the police should know is likely to elicit an inculpatory response: " 'statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word....' " Id. at 301 n. 5 (quoting Miranda, 384 U.S. at 477). Police conduct amounts to interrogation if it is reasonably likely to elicit any response which may be useful to the prosecution.
 
 
 26
 In this case, the DEA agents made various statements which fall squarely within the Innis definition.
 
 
 27
 The first is Ferro's statement that if Bentley revealed her source, the DEA would tell the prosecutor that she had been cooperative. It is difficult to see how any reasonable person could not have expected that this statement would likely elicit an incriminating response. The purpose of such a statement is clearly to produce just such a result; and the statement cannot reasonably appear any other way to a suspect. The fact that Ferro's statement was not an "express question" is immaterial under Innis.
 
 
 28
 The second set of statements which meet the Innis definition includes those made in the "discourse" about Bentley's guilt or innocence. The details of this discussion were not disclosed in the evidentiary hearing, but it is a safe bet that Bentley took the position that she was innocent and the agents took the position that she was not. When the police try to convince a defendant, over her protestations, that she is guilty, they should know that their remarks are likely to elicit an incriminating response--either a confession or a further, possibly damaging, insistence on innocence. The situation here is very different from that in United States v. Crisco, 725 F.2d 1228 (9th Cir.), cert. denied, 466 U.S. 977 (1984). Although the officer in that case also met the defendant's protestations of innocence with the statement that he believed him to be guilty, Crisco involved little more than an explanation of the charges on which the defendant was being arrested--"a brief exchange with agents immediately after [the defendant] was confronted with them." Id. at 1232. Here, by contrast, the agents and Bentley engaged in a lengthy dialogue.
 
 
 29
 The third utterance falling squarely within the Innis definition is the explicit question put to Bentley by Ferro: "what is a 'twist'?" It was this question which finally triggered Bentley's most damaging admission. While it is possible that Ferro did not know what a "twist" was, and hence had no way of knowing whether or not Bentley's answer to her question would be incriminating, Ferro's question must be seen in context. The context was a discussion about a drug transaction, and moreover a transaction which involved the DEA's informant. The conversation clearly concerned criminal activity. Ferro should have known that whatever Bentley said in response to her question, whether exculpatory or inculpatory in intent, would probably be incriminating. Unlike the officer in United States v. LaPierre, 998 F.2d 1460, 1467 (9th Cir.1993), who asked a question when a remark made by the defendant seemed to be altogether incoherent, Ferro asked a question when Bentley was talking about facts closely linked to the crime for which she was arrested. It was reasonable to expect that Bentley's response would be damaging.
 
 
 30
 In all three instances, the agents' statements were objectively likely to produce an incriminating response. Moreover, the agents' intent, which is also relevant under Innis, 446 U.S. at 301-02 & n. 7, was clearly to question Bentley. The agents' conduct indisputably constituted interrogation under Innis.
 
 
 31
 The district court stated that Bentley's statements were not the "result of questioning" but rather "expl[anations of] her position." Possibly the district court meant to suggest that the statements Bentley made were not responses to police conduct. We do not see how the court could have known this. In a conversation which lasted over ten minutes, the agents said certain things--some of which amounted to interrogation--and Bentley said certain things--in most of which she sought to clear herself, and in some of which she gave herself away. While it is perhaps true that not every instance of interrogation by the police had an analogue in an incriminating statement by Bentley (for example, Ferro's promise to talk to the prosecutor may have had little or no effect[4]), it also cannot be said that the agents' conduct did not bring forth any results. When the police engage in a discourse about guilt and innocence with a suspect, it is hard to see how the things the suspect says about her case do not stem from that interrogation.
 
 
 32
 In any event, with respect to Ferro's question about the "twist," Bentley's explanation clearly was responsive. The fact that Ferro asked the question about the "twist" after Bentley had begun to talk does not mean that the question did not constitute interrogation. The fact that it is the suspect who begins talking to the police rather than vice versa may mean that the suspect has waived her right to be free from interrogation, as discussed immediately below. But it does not mean that police questioning does not constitute interrogation. The district court clearly erred in finding that no interrogation had taken place.
 
 2. Waiver
 
 33
 The government bears the burden of showing that a defendant waived her Miranda rights. Terrovona v. Kincheloe, 912 F.2d 1176, 1180 (9th Cir.1990), cert. denied, 499 U.S. 979 (1991); United States v. Heldt, 745 F.2d 1275, 1277 (9th Cir.1984). In order to establish a valid waiver, the government must show two things:
 
 
 34
 First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.
 
 
 35
 Colorado v. Spring, 479 U.S. 564, 573 (1987) (internal citations and quotation marks omitted). See also Bautista-Avila, 6 F.3d at 1364-66; Derrick, 924 F.2d at 820-24. A waiver may be "involuntary" only if it is brought about as the result of police misconduct of some sort. Colorado v. Connelly, 479 U.S. 157, 165, 169-70 (1986). But a waiver may fall short of being "knowing and intelligent" even without improper governmental action: the focus here is on the defendant's state of mind. Derrick, 924 F.2d at 820-21.
 
 
 36
 In the district court, Bentley's counsel used the terms "voluntary," "knowing," and "intelligent" virtually interchangeably. Counsel's focus, however, was on Bentley's state of mind--and hence on whether the waiver was knowing and intelligent--rather than on police misconduct.[5]
 
 
 37
 The fact that a defendant confesses does not give rise to a presumption of waiver. Miranda, 384 U.S. at 475; United States v. Wallace, 848 F.2d 1464, 1475 (9th Cir.1988); United States v. Ramirez, 710 F.2d 535, 542 (9th Cir.1983). But neither is the government required to produce a written waiver of rights, United States v. Calise, 996 F.2d 1019, 1022 (9th Cir.1993), cert. denied, 114 S.Ct. 895 (1994), nor even to show an express waiver of rights. North Carolina v. Butler, 441 U.S. 369 (1979). Under certain circumstances, a court may infer that the defendant waived her rights. Id. at 373-76. In all cases, the court must look at the totality of the circumstances, including the defendant's background, experience, and conduct. United States v. Most, 789 F.2d 1411, 1417 (9th Cir.1986).
 
 
 38
 In many cases, this court has found a waiver to be knowing and intelligent when a defendant has said, in response to questions by the police, that he understands his rights, and that he is willing to talk. E.g., United States v. George, 987 F.2d 1428, 1431 (9th Cir.1993); United States v. Gordon, 974 F.2d 1110, 1116 (9th Cir.1992). The defendant's comprehension need not be perfect. If he understands his rights, it is not fatal that he has not thought through all of the consequences of speaking to the police. Derrick, 924 F.2d at 824. Nor is it fatal that the defendant waives his rights under somewhat distracting circumstances. See George, 987 F.2d at 1431.
 
 
 39
 This court has also held that a defendant's comprehension of his rights may be inferred from previous assertions of those rights, Terrovona, 912 F.2d at 1180, Derrick, 924 F.2d at 824, or simply from previous exposure to the criminal justice system. Id.
 
 
 40
 The present case is analogous to Gordon and to George. Here, as in those cases, there was no signed waiver of rights, but defendant did make an express oral waiver of her rights. Ferro testified that Strahm asked Bentley both if she understood her rights and if she was willing to talk, and that Bentley answered yes to both questions. Bentley herself said that Strahm asked her if she understood what he had said after he had read from the rights form, and that she "screamed and hollered, 'Yes.' "
 
 
 41
 Here, as in George, defendant's Miranda rights were read amidst distracting circumstances: children screaming, possibly officers screaming. But despite these circumstances the defendant appeared to be coherent, and gave responsive answers. See George, 987 F.2d at 1431. And here, as in Terrovona, the defendant had previous experience with the criminal justice system, and testified that she had been read her rights before, and knew what they were.
 
 
 42
 We acknowledge that the district court's finding regarding waiver complicates our review. Under Most, however, even in the absence of findings as to waiver, we must affirm if there is a reasonable view of the evidence to support the result reached by the district court. 789 F.2d at 1417. As the discussion above indicates, the evidence supports a finding of waiver. We therefore affirm the district court's denial of Bentley's motion to suppress.
 
 B. Admission of Other Acts Evidence
 
 43
 We review the district court's admission of other acts evidence for abuse of discretion. United States v. Hill, 953 F.2d 452, 455 (9th Cir.1991).
 
 
 44
 As noted, Bentley's attorney conceded at trial that if the defense questioned the CI about the September 1 conversation, the government, in order to rehabilitate the CI, should be permitted to furnish the context of that conversation, and to reveal that the conversation concerned other drug activity.
 
 
 45
 Bentley's claim on appeal is therefore a narrow one: she argues only that in its attempt to rehabilitate the CI, the government went into too much detail about what was discussed on September 1.
 
 
 46
 Bentley does not explain which details should have been excluded. Possibly her argument is that the government's cross-examination should not even have disclosed that Bentley was to be the seller in the planned transaction. But to leave this fact out could have created the impression that the CI was carrying on his own drug deals with Bentley--in which the CI was seller, not buyer--quite apart from the staged deals supervised by the DEA. Where a defendant touches on otherwise inadmissible evidence in a way that creates a misleading impression, the government is entitled to complete the picture. E.g., United States v. Wales, 977 F.2d 1323, 1326 (9th Cir.1992); United States v. Segall, 833 F.2d 144, 148 (9th Cir.1987). Although the impression which could otherwise have been created by Bentley is not as blatantly misleading as the impression created in Wales and Segall, nevertheless the information presented by Bentley would have been, if seen in isolation, seriously incomplete.
 
 
 47
 Other details to which Bentley may be objecting concern the amount of money and drugs which were the subject of the contemplated transaction. Bentley may be correct that these details were superfluous. But the details were not very damaging. While it is true that they revealed that the drug deal discussed on September 1 was bigger than the deals which were the subject of the charges brought against Bentley, that difference was one of degree only. The uncharged act was not the kind which was likely to inflame the jury against defendant beyond any disapproval engendered by the proof of the charged conduct.
 
 
 48
 In short, the district court did not abuse its discretion in allowing the government to go into as much detail as it did.
 
 
 49
 AFFIRMED.
 
 
 
 *
 Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 There was some dispute on this point. Bentley testified that the officers screamed; the officers testified that they spoke to her in much the same tone of voice they used while testifying in court
 
 
 [2]
 Strahm testified that Ferro also said that Bentley's cooperation would be brought to the attention of the judge. Ferro herself denied this
 
 
 [3]
 At trial, this conversation was described as having occurred on September 2. In its brief, however, the government says that Bentley's arrest occurred on September 2, and that the conversation occurred the day before
 
 
 [4]
 Even this assumption should probably not be made too hastily. In an interrogation, as in any other conversation, cause and effect do not always lie on the surface. A statement may be a response to or the "result" of a previous statement in a subtle, or even in a subconscious way
 
 
 [5]
 Any argument based on police misconduct would fail. Here, there were no threats or violence, no improper influence, and no direct or indirect promises. See Bautista-Avila, 6 F.3d at 1364 (citing United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir.1988)). The closest there was to any such technique was Ferro's promise to inform the prosecutor if Bentley cooperated. But such promises do not render a waiver involuntary. Bautista-Avila, 6 F.3d at 1364